UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

**CRIMINAL NO. 09-66-DCR**

**UNITED STATES OF AMERICA**                                                                                 **PLAINTIFF**

    **v.**

**MICHAEL MCCOY,**                                                                                        **DEFENDANT**

**REPORT AND RECOMMENDATION**

Defendant, Michael McCoy, has filed a motion to suppress physical evidence taken from his vehicle by officers of the City of Covington Police Department. Doc. 16. The United States has filed a memorandum in opposition to the motion to suppress. Doc. 21. An evidentiary hearing was held on October 1, 2009 at 9:30 a.m. Defendant McCoy was present and represented by F. Dennis Alerding; the United States was represented by Assistant United States Attorney Anthony J. Bracke. Four fact witnesses testified at the evidentiary hearing: Sergeant Patrick Noll and Officer Gregory Andrews of the Covington Police Department, Ms. Sheria Aikins, and the defendant.

Neither the defendant nor the United States requested the opportunity to further brief the issues. The motion to suppress is therefore ripe for decision and has been referred for report and recommendation.

**I. Facts**

Sergeant Patrick Noll testified that on May 8, 2009, he and Officer Gregory Andrews, also of the Covington Police Department, were assigned to a detail in Covington, Kentucky and

1

were traveling in a marked cruiser driven by Officer Andrews.  At approximately 3 a.m., Sgt. Noll testified that while driving south on Madison Avenue, the "main" street of Covington, they passed a Cadillac headed in the opposite direction that was being operated without its headlights.  Due to safety concerns, and based upon a suspicion that a driver who is operating a vehicle without headlights at 3 a.m. may be impaired, Officer Andrews immediately turned around and began to follow the Cadillac.  Within about a block the defendant turned left onto 12th Street from Madison; the officers followed for a brief period without activating their lights.  Sgt. Noll explained that they activated their lights for the traffic stop once the defendant's vehicle was at a place where the driver could safely pull over, which occurred within a couple of blocks of the time that they observed him driving without headlights and began to follow.  The driver pulled over to the side of 12th Street when he saw the lights activated, near the intersection of Banklick and 12th Streets.

Officer Andrews proceeded to the driver's side of the vehicle and requested the driver's license and insurance information.  He handed the insurance verification back to the driver and walked back to the cruiser to run a computer check of the license.  During the same period of time, Sgt. Noll had proceeded to the passenger side of the vehicle, carrying his flashlight.  While he waited for his partner to complete the license check, Sgt. Noll continued to shine his flashlight into the interior of the Cadillac.  He observed the defendant as he pulled out a baggie of marijauna from his shirt pocket and placed it between his legs.  He further watched as the defendant reached over, grabbed a nearby Pringles can, put the baggie of marijuana inside the can, closed it back up, and put it back on the passenger seat.  Sgt. Noll testified that he recognized the substance as marijuana from his 16 years' experience in law enforcement, during

which time he has seized marijuana more than 100 times. He further testified that his eyes were focused on the defendant's hands because that focus is part of an officer's training. At the time of these events, Sgt. Noll was no more than 4 feet away from the defendant.

When Officer Andrews returned to the vehicle moments later to verify that the license information was valid and that the defendant had no outstanding warrants, Sgt. Noll quickly advised him that they had "a problem" for which the defendant would need to get out of the car. Officer Andrews then asked the defendant to step out of the vehicle, which he did. As the defendant exited, Sgt. Noll walked around the car, reached in and grabbed the suspicious Pringles can from the driver's door. Sgt. Noll testified that before reaching inside the car, he believed that he had probable cause to believe that the defendant was in possession of marijuana and that he could arrest the defendant on that charge, and that he had additional cause to search the Pringles can. He was able to unscrew the bottom of the Pringles can, at which point he discovered evidence of drugs used to charge the defendant in this case, including crack cocaine, powdered cocaine, and several cellophane baggies of pills.

On cross-examination, Sgt. Noll testified that although he did not observe the defendant turn his lights on during the time that the officers were following the Cadillac, he also did not recall whether the rear tail lights of the Cadillac were on or off the whole time that they were behind the defendant's car. Sgt. Noll observed that the license plate was from Ohio, but did not observe the driver's race prior to the stop,[1] nor did he observe the driver talking on a cell phone. Sgt. Noll further testified that although he could not recall if the top of the Pringles can had the lid on or off, he did observe potato chips on the seat after the stop. He did not observe the

---

[1]The defendant is African-American, as is Officer Andrews.

defendant actually eating Pringles, however.

The defendant's girlfriend, Sheria Aikins, testified that she was in a relationship with the defendant at the time of his arrest and in fact, had been talking on the phone with him at the time that police made the traffic stop. Ms. Aikins was visibly pregnant, and testified that the defendant is the father of the child she is carrying.

According to Ms. Aikins, she called the defendant at around 3 a.m. that evening on his cell phone, but he did not initially answer. He returned her call shortly thereafter, explaining that he had missed her call while he was filling up the gas tank of the Cadillac, a car he was not used to driving. Ms. Aikins testified that the defendant commented to her that he would have to get used to the Cadillac, because his usual car, a 1998 Oldsmobile Intrigue, had lights that illuminated automatically and the Cadillac did not. Out of habit from driving the Oldsmobile, the defendant admitted in the conversation with her that he had neglected to turn on his lights. At one point, Ms. Aikins explained that the defendant told her that "The cops about had me but I just turned my lights on." He also told Ms. Aikins that he was being pulled over but he would "probably" just get a ticket or a warning for the lights. On further questioning, Ms. Aikens' testimony became more equivocal concerning the precise time that she believed the defendant turned on his lights, suggesting that he may have turned them on either before leaving, or while exiting the gas station.

Ms. Aikins testified that she had decided to keep the defendant on the telephone until he returned to her residence and therefore was talking to him up until and including the time that he was directed to get out of the car by Officer Andrews. At that point in time, it became clear to her that the defendant had put the telephone down somewhere inside the car, because she heard

4

the officers "fumbling" around. She also heard noises as if they were dumping something out and heard bits of the officers' conversation, including remarks such as "oh yeah, this is a good one". One of them had never seen whatever it was they were looking at but the other had, remarking, "yeah, there's plenty of them out here but this is a good one." She testified that she believed the officers were referring to the Pringles can with the false bottom. Ms. Aikins testified that she did not fully comprehend what she was hearing at the time, but believed based upon her examination of the car (which was left on the street) following the arrest that the officers had dumped the Pringles chips out of the can all over the car in an attempt to discover how to open the false bottom of the can.

Ms. Aikins was somewhat evasive on cross-examination when asked whether she had observed the Pringles can with the false bottom in the defendant's possession on prior occasions. She testified that she was familiar with and had seen containers with false compartments, whether a pop can or something similar, but she did not know whether the defendant had such a can in his possession at the time. She had seen the defendant with chips and other snacks in the car he drove, but explained that she was unaware if any of those snack items had hidden compartments. She explained that the reason she could not recall or did not know was:

> Because they look so real. I cannot tell you if it was a real pop or a real Pringle can. I can't tell you that it was, because they look real. That's what they were made to, you know, camouflage, look like the real thing.

When asked again if she had seen the defendant with a fake Pringles can, she explained further that she often saw the defendant with snacks, but had no way of knowing if a particular container had a hidden compartment: "I just told you, I've seen many snacks in his car. I've seen Pringles in his car before. I cannot tell you that was the one with the fake bottom."

5

The defendant also took the stand. The defendant admitted he is a convicted felon, having been released on drug trafficking charges oin October 2008. He testified that he filled up his gas tank at a station located at approximately 13th Street and Madison, and that he noticed almost immediately that he had neglected to turn on his lights so he turned them on prior to entering the street. According to the defendant, the officers could not have seen him driving on the street without his lights from the opposite direction because he first pulled out onto Madison Avenue directly in front of their marked police car.

The defendant stated that he was talking with Ms. Aikins on his cell phone from the time he left the gas station until he was pulled over by police. He testified that he did not have any marijuana in his pocket at the time that Sgt. Noll could have observed him placing it into the Pringles can. Instead, he claimed the marijuana in his possession was located in the Pringles can the entire time, along with cocaine, crack, and ecstacy pills. According to the defendant, even though he was well aware of the illicit drugs in the Pringles can that belonged to him, he chose to continue talking on his cell phone with one hand, and to eat chips out of the Pringles can with his other hand, during the time that police had stopped him. He claimed that his girlfriend would not have noticed or known that he was eating chips because he enjoys sucking them instead of crunching them. The defendant further testified that after the officers directed him out of the car, they grabbed the Pringles can and shook the chips all over the vehicle, seemingly frustrated until Sgt. Noll shined his flashlight into the bottom of the now-empty can and discovered that it was too shallow, discovering for the first time evidence of a false bottom. The defendant did not consent to the search.

On cross-examination concerning whether or not he might have kept marijuana in his

6

pocket for personal use, the defendant denied that someone trafficking in drugs would keep drugs for sale in a place different than drugs for personal use because you "don't keep them everywhere." However, he conceded that personal use drugs likely would be kept in separate bags. During his testimony, the defendant appeared to be apprehensive and evasive, frequently pausing and looking towards his attorney before responding to questions from the prosecutor. He was not fully credible.

Officer Andrews also testified. Consistent with the testimony of Sgt. Noll, Officer Andrews explained that the officers originally were headed south on Madison Avenue when the Cadillac with its lights turned off passed by them. He did not observe any tail-lights during the brief period of time that the officers turned around their vehicle to follow the defendant's car prior to stopping him, and therefore did not believe that the defendant ever turned his lights on prior to the decision to stop the vehicle.

## II. Analysis

The defendant's motion to suppress presents two issues: 1) the legitimacy of the initial traffic stop; and 2) the legitimacy of the subsequent search of the Pringles can.

### A. The Initial Traffic Stop

There is little question that the initial traffic stop, for driving a vehicle without lights at 3 in the morning, was justified. To the extent that the testimony of the officers was in contradiction to the defendant's own testimony that he turned on his lights prior to driving on the road, I find that the defendant's testimony was not credible and credit the officers' testimony. Both officers testified consistently and credibly that their attention was drawn to the Cadillac when it passed them going the opposite direction on Madison Avenue with its lights out. The

defendant's testimony that he chose to pull out directly in front of a marked police car seems far less likely under the circumstances.

The testimony of the fourth witness, Ms. Aikens, was equivocal on the timing of when the defendant turned onto the street and turned on his lights. However, I note that in addition to internal inconsistencies in her testimony, Ms. Aikins has a strong motive to support her boyfriend's version of the facts and at the same time, did not physically observe precisely when the defendant turned on his lights. Her recollection of the conversation included testimony that the defendant acknowledged to her that he had begun driving and had neglected to turn on his lights, that the cops "about had me" when he realized that he had forgotten to turn on his lights, and that he was being pulled over but expected only to receive a "ticket or warning" which would be consistent with his understanding that he was being pulled over for driving without headlights. Although the defendant may have turned on his lights within seconds of the police pulling him over, I find that the police did not observe that action and were justified in making the stop.

In short, I conclude that police had probable cause to briefly stop the defendant in his vehicle based upon their observation of the defendant driving several blocks without headlights at 3 a.m. Likewise, it was appropriate for police to request the defendant's driver's license for purposes of running a computer check during that same stop. *See generally Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868 (1968); *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999). Finally, it was both within constitutional boundaries and prudent and reasonable, from a safety perspective, for Sgt. Noll to remain next to the defendant's vehicle while his partner ran the computer check, and for Sgt. Noll to continue shining his flashlight into the vehicle while observing the defendant

during this brief period of time.

### B. The Subsequent Search of the Automobile and Pringles Can

The testimony of the witnesses as to what occurred during the period of time when Sgt. Noll was next to the vehicle differs dramatically but again, I credit the testimony of Sgt. Noll that he observed the defendant remove a baggie of marijuana from his clothing and attempt to hide it in the can. According to the defendant, Sgt. Noll walked around his vehicle instead of observing the defendant at all times. In addition to being contrary to Sgt. Noll's testimony, the defendant's description lacks credibility from the perspective of common sense.

The defendant also claimed that the baggie of marijuana remained well hidden with the rest of the drugs inside the Pringles can with the false bottom at all times during the traffic stop, so that there was absolutely no reason for police to ask him to get out of the vehicle or to search the can. Again, in addition to being contrary to the more credible testimony of Sgt. Noll, the defendant's version of the facts is inconsistent with the facts to which all witnesses agreed, including the defendant. The testimony of all four witnesses indicated that the attention of the officers was immediately focused on the Pringles can. Even according to the defendant and his girlfriend, the officer immediately grabbed the can and dumped the chips out of it, appearing "frustrated" as he searched it for a false bottom. There was no testimony that the officers first searched the trunk, the glove compartment, or other parts of the car. The only witness who suggested that the officers searched elsewhere in the car was the one witness, Ms. Aikins, who was not present and did not observe the proceedings, limited instead to hearing only a small portion of the events through the still-connected cell phone. The defendant and both officers testified the police focus from the outset was on the Pringles can. Yet there would have been

absolutely no reason for the officers to so single-mindedly focus on the Pringles can unless Sgt. Noll had in fact observed the defendant place marijuana in the can.

The defendant himself offered no contrary explanation for the focus on the can, explaining that the only thing Sgt. Noll possibly could have observed was the defendant eating chips out of the can during the stop. The defendant's explanation that he was simply eating chips from the can appears at odds with his admitted knowledge that the can contained a significant amount of contraband that he wished to keep concealed from police. Given that the defendant had been released from his prior sentence on drug trafficking charges just 7 months before, the defendant had a strong motivation to conceal any marijuana that Sgt. Noll might otherwise observe in his pocket. Therefore, considering the demeanor of the testifying witnesses and all of the circumstances, I find credible testimony that Sgt. Noll observed the defendant placing marijuana into the Pringles can while his partner was running a computer license check. Based upon these circumstances, I conclude that the officers had probable cause to order the defendant out of his vehicle and search the can.

When, as in this case, there is probable cause to believe that contraband is concealed in an automobile, police may conduct a warrantless search of that vehicle and any container within it. *See United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157 (1982). No warrant was necessary for the search under the circumstances presented, either for the vehicle or for the Pringles can specifically. *Id., see also United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), *cert denied*, 535 U.S. 1026 (2002).

The recent case of *Arizona v. Gant*, 129 S.Ct. 1710 (2009), in which the Supreme Court clarified that police may not search a vehicle incident to an arrest unless the arrestee is within

10

reaching distance of the vehicle or there is reason to believe that evidence relevant to the crime of arrest might be found, does not change the analysis. *Gant* cited with approval the separate justification for a warrantless search of a vehicle under the parameters set forth in *Ross. See id.*, 129 S.Ct. at 1721. Here, police initially stopped the defendant for a routine traffic violation. They had no other basis for stopping the defendant, but during the course of that routine traffic stop, discovered additional information (directly observing the defendant with contraband) that gave them probable cause to arrest the defendant on a drug offense. At the same time and for the same reason, they were entitled to search the defendant's vehicle and all containers in it without a warrant.

### III. Conclusion and Recommendation

For the reasons discussed herein, **IT IS RECOMMENDED** that Defendant McCoy's "Motion to Suppress" [Doc. 16] **BE DENIED.** Pursuant to Rule 59(b)(2), Fed. R. Crim. P., a party may file particularized objections to this Report and Recommendation within ten days of the date of service "or at some other time the court sets." Given that the final pretrial conference in this case is set for Monday, October 5, and trial is scheduled for October 14, 2009, exigent circumstances demand that time for objections be substantially shortened. Therefore, any objections must be filed on or before **October 7, 2009** with any responses to be filed not later than **October 9, 2009**.

Absent the filing of such objections, further appeal is waived. Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 155 (1985). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir.

1995)(citing *Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991)).  A party may file a response to another party's objections within ten days after being served with a copy of those objections.  *See* Fed. R. Civ. P. 72(b)( Fed. R. Crim P. 59 is silent on responses to objections, but the Advisory Committee Notes indicate that the criminal rule is "derived in part from" this civil one).

      This 2nd day of October, 2009.

Signed By:
*J. Gregory Wehrman*
United States Magistrate Judge